**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Martin, on behalf of the Estate of Vincent Martin,<br><br>    Plaintiff/Counterdefendant,<br><br>vs.<br><br>Great Lakes Reinsurance (U.K.), P.L.C., a foreign corporation,<br><br>    Defendant/Counterclaimant. | No. CV-08-546-PHX-GMS<br><br>**ORDER** |

Pending before the Court are Defendant Great Lakes Reinsurance (U.K.), P.L.C.'s ("Underwriters") Motion for Summary Judgment (Dkt. # 35) and Plaintiff's Cross-Motion for Partial Summary Judgment (Dkt. # 39).[1] For the following reasons, the Court denies Plaintiff's motion and grants Defendant's motion in part and denies it in part.[2]

---

[1] T.L. Dallas, Ltd. was once a defendant in this action, and the parties continue to list it in the caption. The Court, however, dismissed T.L. Dallas, Ltd. as a party on March 23, 2009 (Dkt. # 33). Therefore, the Court orders that the caption be appropriately updated.

[2] Defendant's request for oral argument is denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

**BACKGROUND**[3]

On December 4, 2004, Vincent Martin submitted a renewal application to Underwriters to insure the Rainbow, a ship that was docked in Tahiti. At the time, Vincent Martin had not been to Tahiti for approximately nine months. Vincent Martin did not inform Underwriters of this fact, although the renewal application never requested this information. Underwriters accepted the renewal application and issued an insurance policy.

On June 21, 2005, which was a clear day with calm seas, the Rainbow was discovered partially flooded and sunk while still tied to the dock. Over time, the water accumulated in the bilge, the lowest compartment of a ship, the batteries lost power, and the bilge pumps eventually stopped working.

Multiple times in the summer of 2005, the adjusting firm of Wager & Associates ("Wager") and Underwriters contacted Vincent Martin's son, Chris Martin, and requested a list of damages, photographs, and an explanation of the damage's cause. Chris Martin did not initially respond, but he stated that he was obtaining repair estimates.

On August 3, 2005, one of Underwriters' adjusters estimated that the Rainbow suffered $8,000 in repair costs and found multiple instances of preexisting damage to the Rainbow. On September 6, 2005, Chris Martin informed Underwriters that the damage was caused by a municipal water hose that had been inexplicably connected to a holding tank on the Rainbow. In addition to information about the cause of the flooding, Chris Martin

---

[3] Plaintiff repeatedly violates Arizona Local Rule of Civil Procedure 56.1(e), which requires a party opposing a motion for summary judgment to "include citations to the specific paragraph in the statement of facts that supports factual assertions made in the memoranda." To the extent the Court can easily identify support for Plaintiff's factual assertions in both its statement of facts and in the record, the Court will consider these assertions on the merits. The Court, however, will not consider facts for which it cannot easily find support because "'judges are not like pigs, hunting for truffles buried in briefs.'" *Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (citation omitted).

Both parties also make numerous objections to the opposing parties' facts. The Court has reviewed these objections, and, for the purposes of this Motion only, considers only those facts which are relevant to the motion for summary judgment.

informed Underwriters that the Rainbow had additional damage that appeared to be caused by rats and that he would forward the requested receipts for repair and maintenance.

Later that month, Underwriters and Wager requested additional information from Chris Martin, who indicated that he would quickly respond. Plaintiff asserts that Chris Martin responded by September 24, 2005, but Defendant contends the requested records were not received until May 9, 2006. In any event, the records did not include any actual invoices or receipts, but did include a two-page maintenance log, which Plaintiff contends was the only way the Martins kept maintenance records. Underwriters and Wager made subsequent requests for invoices to accompany the maintenance log, but Chris Martin did not respond.

After Vincent Martin's death in December 2005, Chris Martin arranged for Underwriters to provide an additional survey, which determined that $20,000 would repair damage caused by the water intrusion. The second survey also found that the Martins did not undertake all the measures that could have reduced damage, but the parties dispute the extent to which the report stated that the ship was in an unsatisfactory condition prior to the water intrusion. Later, Chris Martin forwarded two more repair estimates, one by Raiatea Shipyard for $89,247.66, and another by Driscoll's Shipyard for $49,962. In June 2006, Underwriters offered a without-prejudice settlement of the claim for $39,970.85, an amount determined by depreciating the Raietea Shipyard estimate, making deductions based on other policy provisions, and subtracting the policy's deductible. Underwriters told the Martins that if they did not accept the $39,970.85 offer within seven days, then Underwriters would withdraw the offer completely and assert a statute of limitations defense to bar any recovery.

Chris Martin next contacted Underwriters in April 2007, stating that the Rainbow had been towed to Driscoll's Shipyard in San Diego without getting Underwriters' prior approval for the move. In the same correspondence, Chris Martin attached a repair estimate from Western Yacht Commissioning ("Western Yacht") for $190,387. About a week later, Gene Hillger, who performed adjustment work for Underwriters, emailed Underwriters and opined that Western Yacht had a "good reputation" and was "competent to complete the repairs."

1	This lawsuit ensued. Plaintiff alleges claims for breach of contract and bad faith and seeks punitive damages.

## LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. *Id.* at 323. Then, the burden is on the nonmoving party to establish a genuine issue of material fact. *Id.* at 322–23. The nonmoving party "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

# DISCUSSION

**I.　Bad Faith**

The parties dispute whether Arizona or New York law applies because that determines whether Plaintiff may sue for bad faith. Arizona law provides a separate tort remedy for an insured who believes that an insurer acted in bad faith. *See Zilisch v. State Farm Mut. Auto Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) ("The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'") (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). New York, however, does not recognize the tort of bad faith. *Acquista v. N.Y. Life Ins. Co.*, 730 N.Y.S.2d 272, 278 (N.Y. App. Div. 2001) ("We are unwilling to adopt the . . . tort cause of action for 'bad faith' in the context of a first-party claim . . . .).

The policy provides that where no applicable maritime law exists, the "insuring agreement is subject to the substantive laws of the state of New York." (Dkt. # 41, Ex. 3.) Defendant argues that the choice-of-law provision bars the bad faith claim because New York law does not recognize such a tort.

The parties agree that Arizona's choice-of-law rules apply because "[i]n a diversity case, the district court must apply the choice-of-law rules of the state in which it sits."[4] *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). Under Arizona law, a choice-of-law provision is usually upheld, *Landi v. Arkules*, 172 Ariz. 126, 130, 835 P.2d 458, 462 (Ct. App. 1992), but the Court first "must determine whether that choice is 'valid and effective' under Restatement § 187." *Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 266, 77 P.3d 439,

---

[4] Although typically "a federal court sitting in admiralty must apply federal maritime choice-of-law rules[,]" *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997), admiralty procedural law does not apply in this case because removal was based on diversity jurisdiction. "In the case of dual bases of jurisdiction, a plaintiff is not entitled to the procedural benefits which arise from admiralty jurisdiction absent some invocation [of] admiralty." *Kulesza v. Scout Boats, Inc.*, 2000 WL 1201457 at *1 (E.D. Pa. Aug. 8, 2000) (citing *Bodden v. Osgood*, 879 F.2d 184, 186 (5th Cir. 1989)).

441 (2003) (citing Restatement (Second) of Conflict of Laws § 187 (1971) ("Restatement")).

**A. The Choice-of-Law Clause Is Not Valid Under Restatement § 187(1)**.

A choice-of-law provision is effective if the "issue is one which the parties could have resolved by an explicit provision in their agreement." *Cardon v. Cotton Lane Holdings*, 173 Ariz. 203, 208, 841 P.2d 198, 203 (citing Restatement § 187(1)). In this case, the choice-of-law provision is invalid to the extent it would bar a bad faith claim. The key "issue here is whether parties may contractually waive [the bad faith] right or claim." *Swanson*, 206 Ariz. at 267, 77 P.3d at 442. As this District previously noted in this case, the Court must consider "whether an Arizona insured may enter into a contract for security but not fairness—a contract in which the insurer may 'provide the promised protection with one hand while destroying the very objects of the relationship with the other.'" *Martin v. T.L. Dallas, Ltd.*, 2008 WL 2705379 at *3 (D. Ariz. July 9, 2008) (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 155, 726 P.2d 565, 571 (1986)). Given that "Arizona courts recognize the implied covenant of good faith and fair dealing in part because of 'the vast inequities in bargaining power' between insurance companies and insureds[,]" this District held that "an insured, absent adequate bargaining power or meaningful participation in the negotiation of the insurance contract, may not waive a cause of action for insurer bad faith." *Id.* (quoting *Norcia v. Equitable Life Assurance Soc'y of U.S.*, 80 F. Supp.2d 1047, 1048 (D. Ariz. 2000) (citation omitted)); *see also Rawlings*, 151 Ariz. at 154, 726 P.2d at 570 (noting the "disparity in bargaining power"); *cf. Swanson*, 206 Ariz. at 268, 77 P.3d at 443 (finding parties to an employment contract could agree to waive a treble damages award for a bad-faith withholding of wages because the parties had equal bargaining power and were represented by counsel).

In its previous order, this District instructed the parties that it could not determine whether the choice-of-law provision was valid because it was not yet clear what bargaining power the parties had. *Martin*, 2008 WL 2705379 at *4. An issue of fact remains as to whether Vincent Martin had adequate bargaining power. Although Don Spink, a broker, negotiated the policy on the Martins's behalf, Mr. Spink testified that he did not have the

- 6 -

power to negotiate the choice-of-law provision. Mr. Spink had successfully challenged a choice-of-law provision at one point in his career, but that was in another policy in a different negotiation setting. Therefore, an issue of fact remains as to whether the choice-of-law clause is valid under Restatement § 187(1).

**B.     The Choice-of-Law Clause Is Not Valid Under Restatement § 187(2)**.

Aside from Restatement § 187(1), the choice-of-law provision also is unenforceable under Restatement § 187(2), which provides:

> The law of the state chosen by the parties . . . will be applied . . . unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Cardon*, 173 Ariz. at 208, 841 P.2d at 203. The Court need not decide Restatement §187(2)(a) because Defendant does not contest that the choice-of-law clause fails under § 187(2)(b).[5] Plaintiff's brief echoed this District's prior order stating that "[t]he application

---

[5] The parties do not appear to dispute that, under Restatement § 188, Arizona "would be the state of the applicable law in the absence of an effective choice of law by the parties." Under Restatement § 188(1), "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Relevant choice-of-law factors listed under Restatement § 6 include: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Moreover, "[i]n the absence of an effective choice of law by the parties . . . the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." In this case, although New York has some connection to the Defendant foreign corporation, such as an agent of service and a trust account, Arizona has the most significant relationship to the

of New York law on insurance bad faith would be contrary to the fundamental policy of Arizona, a state with a materially greater interest in this case than New York." *Martin*, 2008 WL 2705379 at *3. Defendant has no response to the argument that forcing an Arizona resident to waive his or her right to sue under the tort of bad faith would undercut the doctrine's purpose, allowing the insurer to "provide the promised protection with one hand while destroying the very objects of the relationship with the other." *Id.* at *3. "Arizona courts have affirmatively created a cause of action to protect an insured from the unreasonable actions of an insurer." *Id.* If there is some reason that applying New York law to bar the bad faith claim would not be contrary to Arizona's fundamental policy, Defendant has not raised it.

### C. Summary Judgment Is Inappropriate With Respect to Plaintiff's Bad Faith Claim Under Arizona Law.

Because Arizona law applies to the bad faith claim, the Court considers whether Plaintiff survives summary judgment under Arizona law. To establish bad faith on the part of the insurer, "'a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 506–07, 838 P.2d 1265, 1267–68 (1992) (quoting *Noble v. Nat'l Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). On summary judgment, "[t]he appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and

---

parties and the transaction. It appears that the Martins are from Arizona and the insurance policy was issued to them while in Arizona. The Rainbow was docked in Tahiti, but the Martins visited the Rainbow from Arizona. Arizona also has a strong policy connection because it has an interest in regulating insurance contracts within the state and involving its citizens. It also seems that, given that the parties do not dispute that Arizona law would apply in the absence of a choice-of-law clause, that applying Arizona law would yield predictable, expected, and fair results. Accordingly, the Court compares Arizona law with New York law.

- 8 -

either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280. Therefore, a plaintiff must show both unreasonableness and a mental state—knowledge or reckless disregard. *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104, 735 P.2d 125, 134 (1986).

First, a reasonable jury could conclude that Underwriters lacked a reasonable basis for denying benefits.[6] Underwriters did not inspect the Rainbow for six weeks; although the parties dispute the reason for this delay, this could be construed as an unreasonably long time to avoid inspection. Additionally, on April 18, 2007, Western Yacht submitted a repair estimate of $190,387, which was more than the other estimates and more than Underwriters' offer to settle for $39,970.85. A week later, Gene Hillger, who performed adjustment work for Underwriters, suggested to Underwriters that Western Yacht's estimate was reliable when he stated in an email that Western Yacht had a "good reputation" and was "competent to complete the repairs." Even though other lower repair estimates existed, Mr. Hillger's statements about the Western Yacht estimate is evidence that a jury could consider in assessing the reasonableness of Underwriters' response to the Western Yacht estimate.

Defendant contends it had a reasonable belief that coverage did not exist, based on the absence of maintenance records to rebut the presumption of unseaworthiness, which would have barred coverage. As a preliminary matter, a reasonable jury could conclude both that the ship was seaworthy, as discussed below,[7] and could likewise conclude that a belief to the contrary was not fairly debatable. Moreover, even if policy coverage was fairly debatable, "'[f]air debatability' is not automatically dispositive" because the bad faith tort "depends on the reasonableness of [the insurer's] conduct." *Rowland v. Great States Ins. Co.*, 199 Ariz.

---

[6] Plaintiff's Response lists nine facts it purports are relevant to its bad faith claim. To the extent the Court can discern how each fact is relevant and supported by the record, the Court will consider it. The Court, however, will not consider facts that are unsupported or wholly unexplained.

[7] For a discussion of the Rainbow's seaworthiness and its effect on insurance coverage, see *infra* Section II-B.

- 9 -

577, 585, 20 P.3d 1158, 1166 (Ct. App. 2001); *see also Zilisch*, 196 Ariz. at 237, 995 P.2d at 279 ("[I]n defending a fairly debatable claim, an insurer must exercise reasonable care and good faith."). Given at least some facts suggesting Defendant's delay, refusal to offer higher settlement amounts, and purported threats to deny all coverage, a reasonable jury could conclude that Underwriters did not exercise reasonable care and good faith in processing Martin's claim.

In addition to unreasonableness, Plaintiff has presented facts showing that Underwriters acted either knowingly or with reckless disregard. For example, a jury could conclude that Underwriters knew a reputable estimate of over $190,000 existed, yet consciously disregarded the estimate. Furthermore, Underwriters told the Martins that they had to accept the $39,970.85 offer of settlement within seven days or else Underwriters would withdraw the offer completely and assert a statute-of-limitations defense to bar all recovery. A reasonable jury could infer that this was an unreasonably low offer and that Underwriters attempted to threaten the Martins into accepting the offer by stating that they would otherwise seek to have the entire claim dismissed. Defendant submits evidence that their adjusters believed everything they were doing was reasonable, but this fact might be rebutted by Underwriters' knowledge of higher repair estimates, denial of the claim, and purported threat to withdraw all coverage.

## II. Breach of Contract

The parties agree that federal admiralty law applies to the breach of contract claim because it is based on a marine insurance policy. *See Stanley T. Scott & Co., Inc. v. Makah Dev. Corp.*, 496 F.2d 525, 526 (9th Cir. 1974) (noting that "[a] marine insurance policy is a 'maritime contract[]'" and that claims based on it "'arise[] out of a maritime contract,' and [are] thus within admiralty jurisdiction"); *see also Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054–55 (9th Cir. 1997) (holding that regardless of whether a case is filed under diversity or admiralty jurisdiction, the "same substantive law pertains to the [maritime] claim regardless of the forum").

### A. A Reasonable Jury Could Conclude That the Loss Was Covered as an Accidental or Fortuitous Loss.

The parties agree the insurance policy provides coverage only for "accidental physical loss," (Dkt. # 41), and that the policy is "construed as covering all losses that are 'fortuitous.'" *See Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979). Therefore, the insurance policy does not cover losses that "result[] from . . . ordinary wear and tear[] or from the intentional misconduct of the insured." *Id.* The Plaintiff has the burden of proving that the policy covers the alleged loss. *See Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 307 (2d Cir. 1987) (discussing how "[a]n insured satisfies its burden of proving that its loss . . . was fortuitous").

Both parties move for summary judgment regarding whether the loss was accidental. Plaintiff contends the loss was accidental because some unknown person connected a water hose to the Rainbow, which caused the flooding.[8] In contrast, Defendant contends that the Rainbow was inevitably going to sink from something like hose water because it was not maintained when the Martins were away from the Rainbow for fifteen months. Specifically, Defendant contends the bilge pumps lost power because the electric system failed, meaning the pumps could not displace the hose water fast enough. Neither party, however, has presented sufficient evidence for the Court to determine whether the loss was accidental. Defendant offers no evidence that Plaintiff intentionally caused damage to the Rainbow, and it is unclear whether the loss was caused entirely by wear and tear. A reasonable jury could infer that a hose filled the Rainbow with water, ultimately flooding and damaging the ship in an uncontrollable manner. If so, a reasonable jury could further find that a hose filling the ship was accidental, and Defendant cites no authority holding that insurance coverage is

---

[8] The parties dispute whether a hose caused the flooding, with neither side offering sufficient evidence to resolve the issue upon summary judgment. For purposes of this Motion only, the Court considers this a dispute over the facts and over what reasonable inferences a jury might draw from the facts; the Court therefore examines the facts in the light most favorable to the Plaintiff.

1  barred if a loss is only partially accidental. On the other hand, a reasonable jury might find
2  that a hose did not cause the flooding, but that the lack of maintenance actually caused of the
3  damage. The Court thus denies summary judgment on this issue.[9]

### B. A Reasonable Jury Could Conclude That the Rainbow Was Seaworthy.

The parties agree that, under the policy, Plaintiff cannot recover if the Rainbow was unseaworthy at the time it was damaged. "[W]hen a vessel sinks in calm waters a presumption of unseaworthiness arises." *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 8 (1st Cir. 2001). The insured has the burden to rebut this presumption by producing evidence that the vessel "sank for some reason other than the alleged unseaworthy condition." *Id.* Here, the Rainbow sank while docked on a calm day, so a presumption of unseaworthiness arises. Defendant further supports this presumption by arguing that the Martins's fifteen-month absence from Tahiti prevented regular maintenance that left the Rainbow in an unseaworthy condition.

Plaintiff, however, has submitted evidence to create an issue of fact. This is not the normal situation of a vessel suddenly sinking in calm water. Rather, a unique situation may have occurred—a hose filled the bilge with water, causing damage. Moreover, when the Rainbow was last surveyed in 2003, it was deemed seaworthy and in "good condition." This was less than *two* years before the damage occurred, and Defendant concedes it normally requires an inspection of seaworthiness only every *three* years. Contrary to Defendant's assertion, the fact that the Rainbow was seaworthy less than three years prior to the damage is relevant to its seaworthy condition on the date of the loss. Hence, a reasonable jury could find that the Rainbow "sank for some reason other than [any] alleged unseaworthy condition." *Labarca*, 260 F.3d at 8.

---

[9] The Court also denies Plaintiff's Motion as untimely. The deadline for dispositive motions was August 7, 2009 (Dkt. # 22), and Plaintiff filed its Motion along with its Response on September 21, 2009 (Dkt. # 39).

**C.      A reasonable jury could find the doctrine of *uberrimae fidei* inapplicable.**

"The doctrine of *uberrimae fidei* requires a marine insurance applicant '*even if not asked*, to reveal every fact within his/her knowledge that is material to the risk.'" *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418 n. 1 (9th Cir. 1998) (quoting *Certain Underwriters at Lloyd's v. Montford*, 42 F.3d 219, 222 (9th Cir. 1995)). "'An insurer may rescind an insurance contract if it can show either intentional misrepresentation of a fact, regardless of materiality, or nondisclosure of a fact material to the risk, regardless of intent." *Certain Underwriters at Lloyd's v. Inlet Fisheries, Inc.*, 518 F.3d 645, 655 (9th Cir. 2008) (quoting *Cigna*, 159 F.3d at 420). Defendant does not contend that Plaintiff intentionally made any misrepresentation, so Defendant can void the policy under this doctrine only if Plaintiff made a material nondisclosure. "A [non]disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium." *Id.* at 655 (quoting *N.Y. Mar. & Gen. Ins. Co. v. Tradeline*, 266 F.3d 112, 123 (2d Cir. 2001)).

Defendant argues that Plaintiff improperly responded to a question on the policy application, which asked, "Do you have a caretaker who has access or ability to operate the boat in your absences? If yes provide resume and details." (Dkt. # 35 Ex. 7.) Vincent Martin responded that no such caretaker existed. After the loss, however, Plaintiff stated that Constance Tuhiva acted as the boat's caretaker after the Martins permanently left Tahiti. This argument is insufficient to grant summary judgment because Defendant has not properly "inform[ed] the district court of the basis for its motion" or "demonstrate[d] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. Even if the Martins did not disclose that Ms. Tuhiva was caring for the Rainbow, this nondisclosure is not necessarily material because it may not "affect[] the insurer's decision to insure," *Inlet Fisheries*, 518 F.3d at 655 (internal quotations omitted). If Underwriters issued the insurance policy thinking the Rainbow had no caretaker at all, it is unclear how the actual presence of a caretaker is material. Although "[t]he fact that the insurer has demanded answers to specific questions in an application for insurance is . . . *usually* sufficient to establish materiality[,]"

*Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001) (internal quotations omitted) (emphasis added), it does not follow that an omission is necessarily material if the Martins responded to the question in a way that suggested that Underwriters thought it was taking on an *higher* insurance risk than it actually was. *See Inlet Fisheries*, 518 F.3d at 655 (holding that a fact is material only if it would have affected the insurer's decision to insure at all or to insure at a particular premium). There is an issue of fact because the Martins's response to the application question suggested that Underwriters believed it was insuring a ship without a caretaker, and therefore it is not clear that this nondisclosure would have materially affected Underwriters' decision to insure or to insure at a particular level.

In addition, in one sentence, Defendant's motion alleges five other instances of material omissions: "(1) failure to provide the documents requested by Underwriters; (2) failure to inform Underwriters that Vincent Martin was sick and no longer able to attend the Vessel; (3) failure to provide the dockage agreement; (4) transport of the Vessel to the United States without the permission of Underwriters; and (5) failure to present Dave Fleck at the Vessel." (Dkt. # 35 at 11.) This sentence does not explain how these allegations are material misrepresentations or omissions, and Defendant makes no concerted effort to extrapolate on any of the latter three incidents in its Reply.[10] As to the first assertion, that the Martins failed to provide repair and maintenance documents, Defendant insinuates that this is material because maintenance and repairs are relevant to the ship's condition. However, "[t]he duty [of *uberrimae fidei*] attaches at the time of effecting the insurance . . . for the effect of a concealment in avoiding the policy is to be determined not by its eventual relation to the nature of the risk, but with reference to its immediate influence on the judgment of the underwriter." *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981 (5th Cir. 1969) (internal quotations omitted). Underwriters requested these records for the first time *after*

---

[10] Defendant's only argument regarding these latter three allegations is that Plaintiff did not cite evidence to controvert Defendant's arguments. Defendant's one sentence in its motion, however, was already insufficient to inform the Court of the basis for summary judgment.

- 14 -

the Rainbow had already sunk, and a reasonable jury could find that these records would not have affected Underwriters' *initial* risk assessment when issuing the policy. Similarly, Underwriters requested Vincent Martin's health status after the Rainbow was damaged, but nothing in the initial policy required any immediate or continuing disclosure of his health status. Defendant cites no case, and the Court is not aware of one, applying the doctrine of *uberrimae fidei* to a duty of continuing affirmative disclosure of one's health status on a marine insurance policy. Even though Vincent Martin was one of the insured individuals and primary operators, a reasonable jury could find that his health status was not material to whether Underwriters initially would have issued the same insurance policy. Accordingly, the Court rejects Defendant's argument based on *uberrimae fidei*.

    **D.    A Reasonable Jury Could Find That the Martins Did Not Breach the Cooperation Clause**.

Defendant next argues that the policy's cooperation clause bars Plaintiff's claims. First, as discussed above, the policy includes a choice-of-law clause stating that where no applicable maritime law exists, the "insuring agreement is subject to the substantive laws of the state of New York." (Dkt. # 41, Ex. 3.) Although elsewhere in its brief, Defendant insists upon the enforcement of this choice-of-law clause, Defendant briefs its cooperation clause argument under Arizona law. Defendant thus has provided the Court no reason why summary judgment is appropriate on this issue under New York law.

However, even if Arizona substantive law applies, Defendant's argument still fails. Under Arizona law, "an insured's breach of policy conditions, including the cooperation clause, might be a defense to an action on the policy." *Holt v. Utica Mut. Ins. Co.*, 157 Ariz. 477, 481, 759 P.2d 623, 627 (1988). "[T]o constitute a valid defense, the breach must be material, violating a provision reasonably necessary for the protection of the insurer, and it must substantially prejudice the insurer." *Id.*, 759 P.2d at 627. "[W]hether an insurer has suffered substantial prejudice . . . is generally a factual question[,]" and "[i]t is the insurer's burden to show actual prejudice before it can avoid liability under the insurance policy." *Id.*, 759 P.2d at 627. Moreover, it is not the case that "prejudice automatically follows from the

denial of an opportunity to defend against a claim[,]" especially if the insurer has at least some opportunity to build a defense. *Id.* at 484, 759 P.2d at 630 (internal quotations omitted). In this case, the policy requires an insured to "[c]ooperate with [Underwriters] in the investigation, defense or settlement of any loss and agree to be examined under oath if [Underwriters] so request[s]" and to "[c]omply with any reasonable request made of [the insured], with regard to the loss." (Dkt. # 41 Ex. 3.) Defendant alleges three incidents of a breach of this clause, but the parties dispute whether any of these alleged breaches substantially prejudiced Underwriters.

First, Defendant contends that the Martins never produced maintenance or repair records, substantially prejudicing Underwriters' investigation of the Rainbow's condition. Defendant has not produced sufficient evidence or explanation that would require a reasonable jury to find substantial prejudice. Both Defendant's motion and the cited section of its statement of facts state only that "Plaintiff's failure to produce these records substantially prejudiced Underwriters' investigation into the condition of the Vessel." (Dkt. ## 35, 41 Ex. 3.) The statement of facts cites only one piece of evidence, Doug Wager's declaration, which also concludes only that "[t]he failure to receive [the documents] substantially prejudiced [the] investigation." (Dkt. # 35, Ex. 8.) Although the Court could speculate reasons why this nondisclosure might prejudice an investigation, it will not do so when Defendant has offered no factual explanation for why substantial prejudice occurred.[11]

Second, Defendant contends that Plaintiff did not provide Underwriters with information regarding Vincent Martin's health status. Again, Defendant does not explain how this caused substantial prejudice. The statement of facts and two affidavits state only

---

[11] Defendant contends that Plaintiff should have taken more depositions if it wanted to deny these factual allegations. Defendant, however, has not presented any evidence or explanation beyond mere conclusions. No contrasting deposition testimony is necessary to defeat a motion for summary judgment based only on legal conclusions. *See Celotex*, 477 U.S. at 322 (requiring the moving party to "inform[] the district court of the basis for its motion[] and identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact").

1 that "[t]he failure to respond to these inquiries substantially prejudiced [the] investigation." (Dkt. ## 35, Exs. 8, 10; 41, Ex. 3.) These conclusory statements are insufficient to grant summary judgment.

Third, Defendant contends Chris Martin engaged in "disruptive conduct" that "prevented Underwriters from fully investigating the claim." These actions include failing to provide information and making "outrageous allegations" that Underwriters secretly recorded phone conversations. Again, Defendant has not explained how a phone call substantially prejudiced Underwriters, other than to provide more conclusory statements. The Court will not speculate as to what effect Chris Martin's actions had.

**III. Plaintiffs May Allege Punitive Damages.**

Punitive damages "are recoverable in bad faith tort actions when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent[,]" *Rawlings v. Apodaca*, 151 Ariz. at 163, 726 P.2d at 579, and when the plaintiff can establish these facts by clear and convincing evidence[,]" *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986). This standard requires "'something more' than conduct necessary to establish the tort." *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 598, 734 P.2d 76, 83 (1987). "To obtain tort damages . . . plaintiff must prove only that defendant failed to ascertain the true facts and thus acted without or indifferent to the reasonable basis required for denying the claim[,]" and "[t]o obtain punitive damages, plaintiff must also show that . . . [the defendant] was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured. *Id.*

In this case, a reasonable jury could conclude that Underwriters went beyond normal bad faith, intentionally acting in a way it knew was likely to cause unjustified and significant damage to the Martins. Even if Underwriters believed the loss was not covered due to the lack of an accident, unseaworthiness, the lack of disclosures, or the lack of cooperation, it was not so clear that denial of coverage was justified. Based on present facts, a reasonable jury could conclue that Underwriters wrongfully denied coverage and/or threatened to

withdraw their settlement offer of around $39,000, even though Underwriters was aware of Western Yacht's estimate of over $190,000—an estimate that one of Underwriters' adjusters indicated could be reliable. Moreover, Underwriters' $39,000 offer could be construed as an attempt to strong-arm the Martins into accepting a low-ball amount. Specifically, by threatening to deny coverage completely and to seek a statute-of-limitations defense unless the Martins quickly accepted the offer, a reasonable jury could find Underwriters intentionally put undue pressure on the Martins that would cause substantial loss. These actions in combination could be construed as beyond normal bad faith such that punitive damages are available.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 35) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. # 39) is **DENIED**.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to delete T.L. Dallas, Ltd. from the caption and the parties are directed to use the caption referenced in this Order on all future pleadings.

DATED this 5th day of January, 2010.

_G. Murray Snow_
G. Murray Snow
United States District Judge